IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**MEAGHIN JORDAN, ET AL.**                                                            **PLAINTIFFS**

**V.**                                                **CAUSE NO. 3:15-CV-821-CWR-LRA**

**MAXFIELD & OBERTON HOLDINGS**                                  **DEFENDANTS**
**LLC, ET AL.**

## ORDER

The present question is whether Maxfield & Oberton Holdings (M&O) or its insurers received timely notice of Braylon Jordan's "claim." Disputed issues of material fact precluded summary judgment. *See* Docket No. 224. The parties then stipulated that the matter should be adjudicated on the papers rather than at trial. Great American and Indian Harbor subsequently settled the coverage dispute, but the notice issue must be adjudicated as to Evanston and Scottsdale.[1] The Court will dispense with a factual recitation given the parties' familiarity with this long-running case.

Pretermitting the more difficult issue of whether the newspaper article discussing Jordan's injuries should have been treated as a claim, the great weight of the evidence reveals

---

[1] What follows must discuss Great American's actions and arguments, notwithstanding its settlement, because Evanston and Scottsdale rely in part on Great American's policy. Scottsdale's reliance seems logical enough: it says the underlying policy controls unless Scottsdale's policy has a different term. *See* Docket No. 182-7 at 25. Evanston's position is less clear. In a deposition, Evanston agreed that it "gets to make the decision to use" Great American's definitions, conditions, and exclusions "when it benefits Evanston's coverage position." We see that most clearly when Evanston is asked about its duty to contribute to costs of defense:

    Plaintiffs:     Now, but that portion of the policy conflicts with the Great American policy, right?
    Evanston:     Well, we don't have to take everything that the Great American policy says.
    Plaintiffs:     You don't have to, but you can take some?
    Evanston:     We can take – exactly.
    Plaintiffs:     All right. And whatever benefits Evanston's coverage position, it can take, right?
    Evanston:     Correct.

Docket No. 182-4 at 27. This kind of cherry-picking led to an absurd situation in 2013, where Evanston was using Great American's policy to deny coverage while, at the same time, Great American and Scottsdale both said they had no coverage issues. *Compare id.* at 29-30 (Evanston deposition) *with* Docket No. 182-12 at 1 (Great American email of Mar. 21, 2013) *and* Docket No. 166-16 in 3:15-CV-220 (Scottsdale claim note).

that both insured and insurers alike actually received and recorded the information as a claim made during the 2011-2012 policy period.

**I.     Background**

None of the insurance policies define "claim,"[2] so the parties have sought guidance from New York law.[3] Judge Winter's explanation is useful and thorough:

> Giving the term its ordinary meaning, a claim is an assertion by a third party that in the opinion of that party the insured may be liable to it for damages within the risks covered by the policy. It "must relate to an assertion of legally cognizable damage, and must be a type of demand that can be defended, settled and paid by the insurer." *Evanston Ins. Co. v. GAB Business Servs., Inc.,* 132 A.D.2d 180, 185, 521 N.Y.S.2d 692, 695 (1st Dep't 1987) (interpreting a standard "claim" provision). A claim may be made without the institution of a formal proceeding. . . . A third person's assertion of liability is a claim, moreover, whether or not there is reason to believe that there actually is liability. *Unless the assertion is made in circumstances so unusual that they negate the possibility of a formal proceeding involving defense costs as well as liability, virtually any assertion of an exposure to liability within the risks covered by an insurance policy is a claim.*

*Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 439 (2d Cir. 1995) (emphasis added). "[T]he determination of whether a given demand is a 'claim' within the meaning of a claims made policy requires a fact-specific analysis to be conducted on a case-by-case basis." *F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1331 (5th Cir. 1994) (citation omitted).

Also helpful is a basic understanding for why, exactly, insurance companies require prompt notices of claims. "A notice provision in an insurance policy is essential to giving the insurance company the chance to settle or litigate claims for which it ultimately might be liable." *State of Miss. v. Richardson*, 817 F.2d 1203, 1207 (5th Cir. 1987) (citations, quotation marks, and brackets omitted). The Fifth Circuit continued, "timely notice enables the insurer to investigate a claim against the insured which may be covered by the policy; to itself decide

---
[2] Nothing prevented the insurers from defining "claim" in their policies. *See, e.g.*, *Sealey v. Johanson*, No. 3:15-CV-137-DPJ-FKB, 2016 WL 1273882, at *6 (S.D. Miss. Mar. 29, 2016) (policy provided definition of "claim").
[3] The parties agree that New York law applies to the interpretation of the various insurance policies.

whether the claim should be settled without litigation, and, if not, to prepare its defense." *Id.* New York law is similar. *See Security Mutual Ins. Co. of New York v. Acker-Fitzsimons Corp.*, 31 N.Y.2d 436, 440-41 (1972) ("Notice provisions in insurance policies afford the insurer an opportunity to protect itself, and the giving of the required notice is a condition to the insurer's liability. . . . [T]he insured . . . must exercise reasonable care and diligence to keep himself informed of accidents out of which claims for damages may arise.").

## II.     Discussion

### A.     M&O and Great American

The evidence reveals that M&O met and exceeded these fundamental standards of insurance law. On April 24, 2012, M&O saw a day-old news article about severe injuries its product may have caused Braylon Jordan.[4] It expected a demand for damages to arise and immediately notified its insurers. An insurance company cannot expect more from its insured.

Primary insurer Great American responded reasonably at the time: it opened a claim file for Braylon Jordan, gave it a claim number, repeatedly noted in its internal file that there were "no issue[s] regarding coverage," and said the same thing to the excess insurance companies. So it is curious that in this litigation that Great American and its counterparts now contend that the article about Jordan's injuries amounted only to notice of an "occurrence."[5]

The argument is difficult to credit. Great American received M&O's correspondence at *E&Sclaims@galc.com*, not *E&Soccurrences@galc.com*. Before the policy period ended, Great American worked with M&O, M&O's insurance agent (Marsh), and the excess insurers to coordinate files and make sure they had a full list of all known claimants. Another claimant's

---

[4] M&O was initially not sure it had made the product Braylon ingested, but later articles published during the policy period confirmed it. Its executive testified, "I knew that we controlled the wholesale market, and if they had bought it in a store I – I was almost positive it was Buckyballs, and then at this point it was confirmed that it was Buckyballs." Docket No. 182-5 at 12.

[5] Notice defenses typically ask whether the insured gave its insurance company fair warning of the exposure. Here, though, Great American is complaining that it received too much information, too soon. It is an odd defense.

3

emailed-in newspaper article was fully defended and settled by Great American, M&O testified. And, tellingly, on April 25, 2012—just one day after receiving the Braylon Jordan article—Great American declined to renew M&O's policy because of "claims activity." This despite the fact that at that time, it hadn't received any actual "claims"—according to its after-the-fact, rigid definition of the term.

This course of conduct indicates that Great American treated news of Braylon Jordan's injuries as a claim. It would be of little value to compile and organize dozens of non-claims into spreadsheets. And it is incredible to cite "claims activity" while non-renewing a policy with no claims made. (Great American could have cited "occurrence activity" in its denial if it truly considered all of these notices to be occurrences.) No, the common-sense view is that Great American treated the article, and others like it, as claims.

The evidence is not wholly favorable to M&O. In the same memo where Great American's employee noted no coverage issues, she also announced her "plan" to "monitor to see if a claim is presented." Before the end of the policy period, Great American told M&O's insurance agent that "[n]o formal claims have yet been presented by any Claimants or anyone on their behalf." But these were the exceptions; the weight of evidence shows otherwise.

Great American's policy provided that claims would be considered to be made "when notice of such claim is received and recorded by any insured or by us." So it is relevant, if not dispositive, that M&O also received and recorded the Braylon Jordan news as a claim.[6]

In April 2012, M&O's executive and half-owner put Jordan's name on a list of claims he had been keeping since 2010. "I thought we were going to be sued," he testified. "I – I knew that

---

[6] The Fifth Circuit has expressed the "view that the expectations of the insured upon receiving or responding to a communication or inquiry cannot be determinative of whether a claim has been made because of the uncertainty such a rule would create." *F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1331 (5th Cir. 1994). Our policy language may open that door, but even if not, the concern is moot as insured and insurers all received *and* recorded Jordan's injuries as a claim.

4

this particular case was a – was a problem for our company." Docket No. 182-5 at 10. He added that when he read Great American's response letter, he had "no doubt" that his insurer had recorded it as a claim. *Id.* Claims like Braylon's were exactly the reason he had bought $21 million worth of insurance coverage, he said. *Id.* at 14.

The chronology of events provides further confirmation. When M&O learned that Great American would not renew the policy—again, for "claims activity"—M&O sought to purchase replacement insurance from Indian Harbor. M&O told Indian Harbor that there were dozens of *claims* already made which Indian Harbor would not have to cover. *See* Docket No. 178-9. That is strong, contemporaneous evidence that M&O considered Jordan's injuries to be a claim.[7]

Great American prefers to focus on the newspaper article rather than its actions. Its focus is misplaced in part because claims need not be made by a specific person or arrive in a particular format.[8] The argument also wears poorly in light of a Court of Appeals of New York decision criticizing an insured for *not* forwarding a newspaper article about an accident to its insurance company. The court reasoned that "the insureds had information (the newspaper article) about personal injuries arising from a fire at their building against which certain structural violations had been posted—yet they failed to pursue the facts or reasonably evaluate their potential liability." *Security Mutual*, 31 N.Y.2d at 443. It added that "such information would cause a reasonable and prudent person to investigate the circumstances, ascertain the facts, and evaluate his potential liability"—the very purpose of making a claim *Id.* at 442.

For these reasons, Great American received timely notice during the policy period.

---

[7] Indian Harbor's briefs carefully and persuasively show how its competitors treated the news of Jordan's injuries as a claim. *See* Docket No. 179. Of course, as the 2012-2013 insurer, Indian Harbor certainly had every incentive to argue that coverage fell on the 2011-2012 companies rather than on itself.
[8] Great American and Scottsdale agree that notice of a claim can come from any source; it does not have to come from the injured party or their representative.

5

**B.     Evanston**

In April 2012, M&O's insurance broker sent Evanston, the first excess insurer, a "first report of loss" containing the article about Braylon Jordan's injuries. Evanston assigned the file a claim number and listed a "claim date" of "4/25/12." The insurer now claims that the email was simply a "notice of occurrence." In a deposition, though, it conceded that between the notice date and the end of the policy period, and in fact continuing on through 2012, it never once described or referenced Braylon's injuries as an "occurrence."

More importantly, Evanston also admitted in its deposition that the company does not make a distinction between notices of loss and notices of claims. The result is that the article notifying it of Braylon's loss was equivalent to a notice of claim. That ends the analysis for Evanston. It received timely notice during the policy period.[9]

**C.     Scottsdale**

Scottsdale, the second excess insurer, is in much the same position. When M&O's agent sent information on Braylon Jordan's loss—to Scottsdale's "Claims Department" no less—the insurer assigned Jordan a claim number, treated it like any other claim, and at various points in the file noted "no coverage issues." *E.g.*, Docket No. 166-16 in 3:15-CV-220.

In May 2012, Scottsdale generated a "large loss" "Claim Development Report" listing 20 claimants with Buckyballs-related injuries. Scottsdale's corporate representative testified that the company did not know why the report was produced. Docket No. 182-7 at 23. This statement simply is not true. Scottsdale was later ordered to turn over a January 2014 memorandum which showed exactly why the report was produced. The memo stated, "Unfortunately, the prior claim

---

[9] Evanston says that the plaintiffs first made a claim in December 2012, via a letter written by then-plaintiffs' counsel Eugene C. Tullos. Docket No. 182-4 at 32. The Court agrees that as a matter of common sense, a litigator would deem the Tullos letter to be a notice of claim. It is worth noting, however, that under the various definitions of "claim" advanced by the insurance companies in this lawsuit, the Tullos letter was *not* a claim because it did not explicitly demand damages.

representative noted in the file that she was adding all of those incidents to the Excel spreadsheet 'so that they would have been reported timely.'" Docket No. 197-5.

After discovery closed, Scottsdale got a different corporate representative to attest that there weren't really any claims at all—that its claim file was simply a "Record Only incident file." That obviously contradicts the contemporaneous evidence of its behavior and became subject to a motion to strike. While the Court had indicated that Scottsdale could attempt to explain the contradiction if its second representative testified at trial, Scottsdale's stipulation to hear this case on the papers means that will not happen. The upshot is that the second corporate representative's contradictory testimony cannot be considered. *See S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996).

For these reasons, Scottsdale received and treated information about Braylon Jordan's injuries as a claim first made during the 2011-2012 policy period.

**III.    Conclusion**

If it looks like a duck, swims like a duck, quacks like a duck, and is prepared for dinner like a duck,[10] it's probably a duck. With apologies to ducks, who need not be dragged into insurance law, the same is true here. Information received and recorded as a timely claim by the parties will be deemed a timely claim by the Court. This declaratory action shall proceed against the 2011-2012 excess insurers.

**SO ORDERED**, this the 23rd day of February, 2018.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE

---

[10] *See, e.g.*, GRAMPA "JJ" DAVIS, GRAMPA'S WILD GAME RECIPES 67-83 (2009) (over two dozen duck recipes); HANK SHAW, DUCK, DUCK GOOSE: RECIPES AND TECHNIQUES FOR COOKING DUCKS AND GEESE, BOTH WILD AND DOMESTICATED (2013) (noting that cooking a duck is "an act of expression . . . a way to find that forgotten feast we Americans once enjoyed"); TED ALLING, THE ULTIMATE DUCK COOKBOOK: 25 DELICIOUS DUCK RECIPES FOR THE AVERAGE DUCK ENTHUSIAST! (2016) (cautioning cooks to "never be afraid to add some dry rub to your duck").